UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

HIND SALEH,

Petitioner,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

Respondent.

DECISION and ORDER

18-CV-1347F

(**consent**)

---

AEAD FARHAN,

Petitioner,

v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

Respondent.

18-CV-1348F

(**consent**)

---

APPEARANCES:

ANNE E. DOEBLER, ESQ.
Attorney for Petitioners
14 Lafayette Square
Suite 1800
Buffalo, New York 14203

TRINI E. ROSS
UNITED STATES ATTORNEY
Attorney for Respondent
DANIEL BARRIE MOAR
Assistant United States Attorney, of Counsel
Federal Centre
138 Delaware Avenue
Buffalo, New York 14202
and
ADAM A. KHALIL
Assistant United States Attorney, of Counsel
100 State Street
Rochester, New York 14614

## **JURISDICTION**

On May 7, 2021, the parties to these actions consented pursuant to 28 U.S.C. § 636(c) to proceed before the undersigned. (18-CV-1347F, Dkt. 55; 18-CV-1348F, Dkt. 47). The matter is presently before the court on Respondent's motions for summary judgment filed May 17, 2021 (18-CV-1347F, Dkt. 56; 18-CV-1348F, Dkt. 47).

## **BACKGROUND**

On November 12, 2018, Petitioners Hind Saleh ("Saleh") and Aead Farhan ("Farhan") (together, "Petitioners"), a wife and husband then proceeding *pro se*, commenced these actions 18-CV-1347F ("Saleh Action"); 18-CV-1348F ("Farhan Action"), seeking *de novo* review of the denial of their respective applications for naturalization, pursuant to § 310(c) of the Immigration and Nationality Act ("INA" or "the Act"), 8 U.S.C. § 1421(c) ("INA Claim"), Saleh Action Petition ¶¶ 31-34; Farhan Action Petition ¶¶ 31-34, and under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq*. ("APA Claim"), Saleh Action Petition ¶¶ 35-37; Farhan Action Petition ¶¶ 35-37. Petitioners named as Respondents then Attorney General William Barr, Acting Secretary of Homeland Security Chad Wolf, Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Services, and Buffalo Field Office Director, USCIS Carmen M. Whalen (together, "Original Respondents"). On August 6, 2020, Original Respondents moved to dismiss the Petitions (Saleh Action, Dkt. 33; Farhan Action, Dkt. 27) ("motions to dismiss") for naming as respondents various federal officials instead of the United States Customs and Immigration Service ("USCIS") as required by the relevant regulation, 8 C.F.R. § 336.9(b), as well as Petitioners' APA

claims which did not provide for judicial review of Petitioners' naturalization applications which were reviewable in federal district court only pursuant to § 310(c) of the INA, 8 U.S.C. § 1421(c). In a Decision and Order filed February 18, 2021 (Saleh Action, Dkt. 54; Farhan Action, Dkt. 45), District Judge Elizabeth A. Wolford granted the motions to dismiss in both the Saleh and Farhan Actions, dismissing the APA claims and substituting USCIS as the sole respondent for the original respondents who were dismissed in both actions.

On May 17, 2021, Respondent filed in both actions the instant motions for summary judgment[1] (Saleh Action, Dkt. 56; Farhan Action, Dkt. 47), attaching the Declaration of Amanda Pike (Saleh Action, Dkt. 56-1; Farhan Action, Dkt. 47-1) ("Pike Declaration"), with exhibits A through F (Saleh Action, Dkts. 56-2 through 56-7; Farhan Action, Dkts. 47-2 through 47-7) ("Pike Dec. Exh(s). __"), the Declaration of Matthew Harlach (Saleh Action, Dkt. 56-8; Farhan Action, Dkt. 47-8) ("Harlach Declaration") with exhibits 1 through 13 (Saleh Action, Dkts. 56-9 through 56-21; Farhan Action, Dkts. 47-9 through 47-21) ("Harlach Dec. Exh(s). __"), the Declaration of Assistant United States Attorney Daniel B. Moar (Saleh Action, Dkt. 56-22; Farhan Action, Dkt, 47-22) ("Moar Declaration"), with exhibits 14 through 18 (Saleh Action, Dkts. 56-23 through 56-27; Farhan Action, Dkts. 47-23 through 47-27), the Statement of Material Facts Required by Local Rule 56 (Saleh Action, Dkt. 56-28; Farhan Action, Dkt. 47-28) ("Respondent's Statement of Facts"), and Respondent's Memorandum of Law in Support of Motion for Summary Judgment (Saleh Action, Dkt. 56-29; Farhan Action, Dkt. 47-29)

[1] The court notes Respondent filed identical papers in both summary judgment motions.

("Respondent's Memorandum"). In opposition to Respondent's Motions, Petitioners[2] filed on August 20, 2021, Petitioner's Response to Respondent's Statement of Undisputed Facts (Saleh Action, Dkt. 67 at 1-6; Farhan Action, Dkt. 57 at 1-6) ("Petitioners' Responding Statement of Facts"), attaching Petitioner's Response to Motion for Summary Judgment Statement of Facts (Saleh Action, Dkt. 67 at 7-13; Farhan Action, Dkt. 57 at 7-13) ("Petitioners' Statement of Facts"), and Petitioner's Memorandum in Opposition to Respondent's Motion for Summary Judgment (Saleh Action, Dkt. 67 at 14-21; Farhan Action, Dkt. 57 at 14-21) ("Petitioners' Response"), with exhibits A through E or F (Saleh Action, Dkts. 67-1 through 67-5; Farhan Action, Dkts. 57-1 through 57-6) ("Petitioners' Exh(s). __"). On September 20, 2021, Respondent filed Respondent's Reply Memorandum of Law in Further Support of Motion for Summary Judgment (Saleh Action, Dkt. 68; Farhan Action, Dkt. 58) ("Respondent's Reply"). Oral argument was deemed unnecessary.

Based on the following, Respondent's Motions are GRANTED.

## FACTS[3]

Petitioners Hind Saleh ("Saleh") and Aead Fahran ("Fahran") are natives of Iraq. In 1996, Fahran, then a teenager, was arrested in Iraq and sentenced to three years of incarceration in an Iraqi prison for a gun crime, and served two years and three months of the sentence. Saleh and Farhan (together, "Petitioners"), were married on March 13, 2003, in Ramadi, Iraq ("Ramadi"), after which Saleh moved into her in-laws' house in

---

[2] The court notes the papers responsive to Respondent's identical summary judgment motion papers are also identical, with the exception that Farhan filed an additional exhibit.
[3] Taken from the pleadings and motion papers filed in this action.

Ramadi. In addition to Petitioners, the household ("the Farhan household") included Farhan's parents, and siblings among which were Farhan's brothers Imad who was two years older than Farhan, and Ziyad who was younger than Farhan[4] ("Farhan's brothers").[5] As a member of the Farhan household, Saleh assisted her mother-in-law with maintaining the household including cooking, cleaning, and serving meals. Because Farhan's brothers were present in the Farhan's household, they also benefitted from Saleh's contributions to the household although Saleh did not socially interact with Farhan's brothers and Saleh's knowledge of their activities was limited to what Saleh overheard. Saleh maintains she was afraid of Farhan's brothers and knew Imad was a "fighter." Petitioners' Responding Statement of Facts ¶ 7.

On March 20, 2003, Operation Iraqi Freedom was launched when the United States military led a coalition ("the Coalition Forces") in invading Iraq. Ramadi, as the capital of Iraq's Al Anbar province, became a focal point of the military conflict which also included numerous insurgent groups that often opposed the Coalition Forces. One such insurgency group was Al Qaeda,[6] which is designated under the INA as a "Tier I terrorist organization." 8 U.S.C. § 1189(a). Fahran's brothers were members of Al Qaeda. Imad killed numerous people and was involved in an Iraqi prison escape in which several Iraqi prison guards and police officers were killed. Ziyad was also a member of Al Qaeda but his contributions were mainly limited to providing such ancillary support as maintaining vehicles for the organization.

[4] In the papers, Imad is also referred to as "Emad," and Ziyad is also referred to as "Zyad" and "Ziad." In the interest of consistency, the court refers to them as "Imad" and "Ziyad."
[5] Farhan had additional siblings, although it is not clear from the record if all of Farhan's siblings were members of the Farhan household.
[6] For the purpose of consistency, the court uses the spelling "Al Qaeda" despite various spellings in the record.

In contrast to his brothers, Farhan worked in Iraq for the Ministry of Education and was friends with the Governor of Al Anbar, Ahmed Khalaf Mohamed, also known as Ahmed Khalaf Al-Dulami. Between 2004 and 2007, Farhan voluntarily acted as an informant to the U.S. military forces ("U.S. Military") in Iraq, often providing information received from Imad to the U.S. Military, but not revealing to the U.S. Military that the source of the information was Fahran's brother, Imad. According to Farhan, he covertly worked with the Iraqi government and Coalition Forces including the U.S. Department of Defense ("DOD"), Central Intelligence Agency ("CIA"), and the Joint Special Operations Task Force ("JSOTF"). Farhan met weekly with Coalition Forces at "Camp Blue Diamond" which was a Coalition Forces base in Ramadi. In connection with his covert work with the Coalition Forces, Farhan was provided with a satellite phone, computer, and a device used for locating military objectives by Coalition Forces, but declined to accept a larger suitcase device which Farhan feared he would not be able to keep from being discovered at his home. In connection with his covert work, Farhan facilitated the targeting of his childhood friend, one Rafa Abdul Salam ("Rafa"),[7] an Al Qaeda member in Iraq, who was killed by a U.S. Military airstrike. Farhan did not disclose his covert work until after Petitioners came to the United States and Saleh maintains she was aware Farhan's brothers were "fighters" for the insurgency, but was unaware of any particular activities in which the brothers engaged in furtherance of the insurgency.

On January 10, 2007, Fahran was shot in the head and sustained a traumatic brain injury. Fahran later learned he had been targeted by several of Ziyad's friends to retaliate against Fahran for providing information to the U.S. Military. In Iraq, Fahran

---

[7] Although "Rafa" is sometimes referred to as "Rafi" and "Rafe'"in the record, in the interest of consistency, the court refers to this individual only as "Rafa."

was unable to obtain appropriate treatment for his head injury which affected Fahran's memory and rendered him wheelchair bound for two years, so Petitioners went to Syria for Fahran's treatment. Petitioners stayed in Syria for several years. Petitioners initially lived in Syria with Imad and his family until Imad returned to Iraq at some unidentified time before 2010. Upon returning to Iraq, Imad was arrested and sentenced to prison for his involvement with Al Qaeda including murdering others. In December 2008, Imad managed to escape from prison but was killed by Iraqi police.

On December 5, 2007, Petitioners applied through United Nations High Commissioner for Refugees ("UNHCR") in Damascus, Syria, for admission as refugees to the United States by filing with USCIS a Registration for Classification as a Refugee Form I-590 ("Refugee Application").[8] In completing the Refugee Application, Farhan responded "No" to a question regarding whether he had every been arrested, committed any crimes, or helped someone else commit any crimes, as well as to another question regarding whether Farhan had ever provided support to any person or organization that ever engaged in any form of terrorist activity. Nor did Farhan disclose his relationship with his brothers. Both Farhan and Saleh were separately interviewed by USCIS agents on December 5, 2007 in connection with their Refugee Application and provided sworn statements.[9] Because a background check of Farhan revealed Farhan's arrest in Iraq in 1996, Farhan was re-interviewed by a USCIS agent on March 27, 2008. When questioned about the arrest, Farhan initially indicated he had never been arrested, but

[8] A copy of the Refugee Application is filed as Harlach Dec. Exh. 1 (Saleh Action, Dkt. 56-9; Farhan Action, Dkt. 47-9). The Refugee Application is in Fahran's name as he is considered the "primary applicant," and no separate refugee application was completed by Saleh who is considered the "derivative applicant" to Farhan's Refugee Application. Petitioners' Statement of Facts ¶ 30.

[9] A copy of Farhan's sworn statement is filed as Harlach Declaration Exh. 1 (Saleh Action, Dkt. 56-9; Farhan Action, Dkt. 47-9). No copy of Saleh's sworn statement is in the record.

when confronted by the USCIS agent with his Iraqi arrest record, Farhan explained the arrest occurred after Farhan took and sold a neighbor's pistol so as to give the proceeds of the sale to the neighbor, for which Farhan was detained by police "for a few days," but was never actually incarcerated. Refugee Application Assessment at Bates 0354, 0358-59.[10] Farhan also stated he had assisted the U.S. Military in Iraq, and that he feared Al Qaeda because Al Qaeda had tried to assassinate him because Farhan worked for the Iraqi government and he was friends with Al Anbar's Governor. USCIS denied the Refugee Application because Farhan's conviction constituted a crime involving moral turpitude rendering Farhan inadmissible pursuant to INA § 212(a)(2)(A)(i)(I); 8 U.S.C. § 1182(a)(2)(A)(i)(I). *Id*. at Bates 0359. On September 27, 2009, however, USCIS granted Farhan a waiver of inadmissibility.[11] *Id*. at Bates 0360. On September 1, 2010, Petitioners were admitted as refugees to the United States and settled in Buffalo, New York.

On September 9, 2011, Petitioners filed applications for permanent residency in the United States, completing Form I-485, Application to Register Permanent Residence or Adjust Status ("Status Adjustment Application"),[12] certifying under penalty of perjury the information on the Status Adjustment Application forms was true and correct and that no information that would affect the applications' outcome was withheld. On their respective Status Adjustment Applications, both Saleh and Farhan checked the boxes for "No" for questions inquiring whether they had ever been arrested, charged,

[10] Filed as Harlach Declaration Exh. 2 (Saleh Action, Dkt. 56-10; Farhan Action, Dkt. 47-10).
[11] Why Farhan was granted an inadmissibility waiver is not clear from the record.
[12] Copies of Petitioners' Status Adjustment Applications are filed as Harlach Exhs. 3 (Saleh Action, Dkt. 56-11; Farhan Action, Dkt. 47-11 (Saleh)), and 4 (Saleh Action, Dkt. 56-12; Farhan Action, Dkt. 47-12 (Farhan)).

convicted, or imprisoned for any crime. Status Adjustment Applications, Part 3, Question 1. Petitioners also checked the box for "No" for the question asking whether they had provided "any type of material support to any person" engaged in "any . . . form of terrorist activity?" Status Adjustment Applications, Part 3, Question 4. On February 3, 2012, both Petitioners' Status Adjustment Applications were approved with Petitioners granted lawful permanent resident status in the United States.

On June 9, 2015, Saleh filed with USCIS an application for naturalization, completing Form N-400, Application for Naturalization ("Saleh's Naturalization Application").[13] On July 16, 2015, Farhan filed with USCIS an application for naturalization, completing Form N-400 ("Farhan's Naturalization Application").[14] In completing their respective Naturalization Applications, both Petitioners checked boxes indicating their answer was "No" to questions regarding whether they were ever associated with a terror organization, been arrested, charged or convicted of a crime, or been incarcerated, and provided signatures under penalty of perjury attesting to the accuracy of the information on the applications. Upon receiving Petitioners' Naturalization Applications, USCIS arranged for each to be interviewed by a USCIS officer to verify the accuracy of the information contained in the Naturalization Applications. Petitioners were interviewed several times by the Federal Bureau of Investigation ("FBI") in connection with their Naturalization Applications, with the substance of each interview memorialized in a 302 Report ("302 Report") prepared by

[13] Filed as Harlach Declaration Exh. 5 (Saleh Action, Dkt. 56-13; Farhan Action, Dkt. 47-13). Saleh's Naturalization Application is dated June 5, 2015 by Saleh, and bears a stamp indicating it was received by USCIS on June 9, 2015.

[14] Filed as Harlach Declaration Exh. 6 (Saleh Action, Dkt. 56-14; Farhan Action, Dkt. 47-14). Farhan's Naturalization Application is dated July 7, 2015 by Farhan, and bears a stamp indicating it was received by USCIS on July 16, 2015.

the interviewing agents. During the FBI interviews, Farhan admitted for the first time since entering the United States that he had brothers and friends who were involved with Al Qaeda, and eventually also admitted that he was criminally convicted in Iraq in 1996, for which he was imprisoned in Iraq.

In particular, FBI Special Agent ("SA") Amanda Pike ("SA Pike"), first interviewed Farhan on June 8, 2015,[15] for which SA Pike prepared a 302 Report ("Farhan's June 8, 2015 302 Report").[16] Pike Declaration ¶¶ 5-6. During the June 8, 2015 interview, Farhan stated that while living in Iraq, he voluntarily acted as an informant to the U.S. Military, claiming he regularly provided information to "Keith," whom Farhan described as a "high ranking" U.S. Army officer, about Al Qaeda activity. Pike Declaration ¶ 8; Farhan's June 8, 2015 302 Report at Bates 0346-48. Farhan also provided U.S. Military with information about Al Qaeda including that Farhan's brothers Imad and Ziyad were active Al Qaeda members, as well as several friends including one "Rafa." Pike Declaration ¶ 8; Farhan's June 8, 2015 302 Report at Bates 0347-48. Imad was detained by U.S. Military which turned Imad over for imprisonment by the Iraqis when the U.S. Military began withdrawing from Ramadi. Farhan's June 8, 2015 302 Report at Bates 0347. While imprisoned by the Iraqis, Imad attempted to escape but was killed by Iraqi police. *Id*. Ziyad also worked for Al Qaeda, albeit not as a fighter like Imad, but performing such manual labor as washing cars. *Id*. at Bates 0348. In 2010, Farhan learned from another brother, Ala ("Ala"),[17] that Ziyad had been killed. *Id*. Farhan

[15] It is not clear from the record why SA Pike interviewed Farhan on June 8, 2015, when Farhan's Naturalization Application was not received by USCIS until July 16, 2015, and Saleh's Naturalization Application was not received by USCIS until June 9, 2015. SA Pike points out Farhan's June 8, 2015 302 Report is actually dated June 5, 2015, which SA Pike attributes to a "typo." Pike Declaration ¶ 9 n. 1.
[16] Pike Declaration Exh. A (Saleh Action, Dkt. 56-2; Farhan Action, Dkt, 47-2).
[17] Farhan did not report that Ala was a member of Al Qaeda.

believed it was Ziyad's friends who shot Farhan in 2007. *Id*. Farhan also stated that although Imad was a "fighter," Imad was a "good guy" and Farhan was not afraid of him, but that Farhan was afraid of Ziyad whom Farhan described as a "bad guy" and "immature." *Id*. Farhan concluded the interview by saying that in light of the information he provided the U.S. Military, Farhan should be "spoiled" and "treated very well" by the American government. *Id*. at Bates 0350.

SA Pike also interviewed Saleh on June 8, 2015, for which SA Pike prepared a 302 Report ("Saleh's June 8, 2015 302 Report").[18] Pike Declaration ¶¶ 11-14. As relevant to this action, Saleh reported Farhan was shot on January 20, 2007, but Saleh did not know who shot Farhan. Saleh's June 8, 2015 302 Report at Bates 338. Because the hospital in Mosul, Iraq was unable to treat Farhan's head injury, they traveled to Syria where the medical care was better. *Id*. Saleh reported Imad was killed by Iraqi police while attempting to escape from prison. *Id*. Saleh believed Ziyad was killed while driving a cab. *Id*.

USCIS interviewed Farhan on February 9, 2016, Harlach Declaration ¶ 34, and Saleh on February 9, 2017. *Id*. ¶ 36. Although no copies of any 302 Reports for Farhan's February 9, 2016 interview or Saleh's February 9, 2017 interview are in the record, the substance of such interviews is recounted in the USCIS December 28, 2017 Decisions denying Petitioner's Naturalization Applications. Harlach Declaration Exhs. 11 ("Farhan's Denial"), and 12 ("Saleh's Denial").

In Farhan's February 9, 2016 interview, the interviewing USCIS officer asked Farhan several questions to determine Farhan's ability to recall dates and explain

[18] Pike Declaration Exh. B (Saleh Action, Dkt. 56-3; Farhan Action, Dkt. 47-3).

answers to questions on Farhan's Application in light of Farhan's traumatic head injury. Farhan's Denial at 2. Farhan readily and rapidly recalled the four different addresses where he lived over the previous five years, the length of time residing at each address, the rent Farhan paid at each address, and the exact dollar amount received in cash assistance from the U.S. government. *Id*. Farhan stated his brothers Imad and Ziyad were involved in terrorist acts, that he last saw Ziyad in 2007 in Iraq, and Imad in 2008 in Syria, and that Imad was killed by Iraqi forces when Imad tried to escape prison in 2008, and Ziyad was killed in 2010 presumably by Iraqi forces. *Id*. Farhan maintained he knew since 2003 that both Imad and Ziyad were involved with terrorism and that his brothers were the source of the information Farhan provided to the U.S. Military. *Id*. Farhan further stated that after joining Al Qaeda, Imad and Ziyad lived in the same house as Farhan for a while, during which Saleh cooked for Farhan's brothers, and Farhan described his relationship with his brothers as "great." *Id*. at 3. When asked why, on his Status Adjustment Application, Farhan denied having any link to terrorists, Farhan answered, "I have nothing to do, I'm not responsible for what my brothers do. Everyone is responsible for their own doing." *Id*. Farhan further explained he did not disclose his brothers' terrorist activities on the Status Adjustment Application or his Refugee Application because the forms did not seek such information and Farhan did not "want to talk about other people's business." *Id*. The only reference to Saleh's February 9, 2017 interview is that she failed her United States history examination.[19] Saleh Denial at 2. Following these interviews, both Farhan and Saleh executed sworn

[19] Saleh's Denial refers to Saleh's interview as taking place on February 9, 2016, *i.e.*, on the same day as Farhan's interview.

statements under penalty of perjury attesting to the veracity of their respective statements.

On April 25, 2017, both Farhan and Saleh were further interviewed under oath by USCIS in connection with their Naturalization Applications. During the interview Saleh stated that when she and Farhan were first married, they lived in the Farhan household, along with Farhan's brothers, Imad and Ziyad, and that after Petitioners moved into their own home, Farhan's brothers often visited Petitioners and during the visits, Saleh cooked and provided them with food, tea and coffee. Saleh April 25, 2017 Interview Tr. at Bates 0191.[20] According to Saleh, she and Farhan moved into their own home in a different neighborhood because Farhan's political principles were so different from those of his brothers. *Id*. at Bates 0195. Saleh further stated although she knew Farhan's brothers were fighters, Saleh did not know they were members of Al Qaeda until they went to jail. *Id*. at Bates 193.

During his April 25, 2017 interview, Farhan again stated his brothers were Al Qaeda members, asserting that prior to leaving Iraq, Farhan reported about the activities of his brothers and his brothers' friends to the U.S. Military in Iraq, describing the work he performed for the U.S. Military as "extremely important" and "serious," advising there should be a digital record within the U.S. government of the information Farhan provided. Farhan April 25, 2017 Interview Tr.[21] at Bates 0247; Farhan's April

[20] References to "Saleh April 25, 2017 Interview Tr." are to the Bates-numbered pages of the transcript of Saleh's April 25, 2017 interview, filed as Harlach Declaration Exh. 8 (Saleh Action, Dkt. 56-16; Farhan Action, Dkt. 47-16). The court notes no 302 Report summarizing Saleh's April 25, 2017 interview is in the record.

[21] References to "Farhan April 25, 2017 Interview Tr." are to the Bates-numbered pages of the transcript of Farhan's April 25, 2017 interview, filed as Harlach Declaration Exh. 7 (Saleh Action, Dkt. 56-15; Farhan Action, Dkt. 47-15).

25, 2017 302 Report[22] at 1-2. Farhan reiterated his belief that Imad and Ziyad were killed because of their affiliation with Al Qaeda, although Farhan never received confirmation of Ziyad's death, and described Imad as "strong and wise," and Ziyad as young and immature which made Ziyad "more dangerous." *Id*. Farhan also reported his friend, Rafa, was a mid-level leader with Al Qaeda in Iraq, directly below al-Zaquawi, a known senior Al Qaeda leader, and that Imad was directly below Rafa. Farhan's April 25, 2017 302 Report at 2. Farhan recalled that after being shot and transported to Syria for medical treatment in January 2007, the U.S. Military offered to transport Farhan back to Iraq for medical treatment at the American base, but Farhan declined the offer because he was then living with Imad and did not want Imad to know about Farhan's association with the U.S. Military in Iraq. *Id*. Farhan also admitted that when interviewed in connection with his Refugee Application, he was not truthful regarding his association with terrorists and terrorist organizations through his brothers and friends because he believed providing truthful answers to such questions may jeopardize his Refugee Application. *Id*. Nor was Farhan truthful when he failed to reveal his arrest and conviction on the gun possession charge because he feared his Refugee, Status Adjustment and Naturalization Applications would be denied, and Farhan did not believe the 25-year old criminal conviction under the Sadaam Hussein regime was relevant. Farhan April 25, 2017 Interview Tr. at Bates 0267-68. Although Farhan admitted at the April 25, 2017 interview that he was imprisoned for the gun possession crime, Farhan did not advise his sentence was for three years. *See id*. (Farhan admitting to being imprisoned for the conviction but not discussing his sentence).

[22] Pike Declaration Exh. C (Saleh Action, Dkt. 56-4; Farhan Action, Dkt. 47-4) at 1.

Farhan was again interviewed by SA Pike on October 4, 2017, at Farhan's request because Farhan's SSI benefits had been discontinued because Farhan failed to become a naturalized citizen within seven years as required for immigrants who receive federal financial assistance. Farhan's October 4, 2017 302 Report at Bates 0330.[23] Farhan again claimed to have provided information about his brothers to the U.S. Military, asserting he first reported information he received from Imad, later reported the information was received from Imad, and that based on such information, Imad and Ziyad were arrested and jailed, asserting that Farhan's work for the U.S. Military could be corroborated by information that should be stored in the computers of the U.S. Military's base, "Blue Diamond," possibly under the name "Abu Hamza," the name Farhan maintains the U.S. Military called him. *Id*. at Bates 0330-31. Farhan again asserted the U.S. Military considered the information Farhan provided to be of such great importance that the U.S. Military provided Farhan with "sensitive equipment" including a pistol and a satellite phone, as well as a device that allowed the U.S. Military to identify Farhan's location with aircraft. *Id*. at Bates 0331. Farhan further stated that when seeking refugee statues, he failed to disclose to the U.N. workers he had provided information to the U.S. Military because he did not fully trust the U.N. workers. *Id*. SA Pike then informed Farhan his claims about assisting the U.S. Military, specifically with regard to Farhan's brothers, could not be corroborated, Farhan stated that initially he may have failed to report Imad was the source of his information and an Al Qaeda member because he believed Imad was basically a good person who could be persuaded to quit Al Qaeda. *Id*. at Bated 0332. Farhan also questioned why the FBI

[23] Pike Declaration Exh. D (Saleh Action, Dkt. 56-5; Farhan Action, Dkt. 47-5).

was focusing only on Imad in light of the information Farhan provided about Rafa which Farhan considered to be more important, and Farhan offered to take a polygraph test. *Id*.

On October 25, 2017, Farhan underwent a polygraph test administered by FBI Special Agent James J. Markovich ("SA Markovich"), the results of which are reported on Form FD-498 ("Form FD-498").[24] Farhan stated that in 2006, after his entire family was arrested and detained for several days on suspicion of terrorism, Farhan voluntarily reported to the U.S. Military that Imad was involved with Al Qaeda following which Imad was detained for six months.[25] Form FD-498 at Bates 0334. Farhan did not also report on Ziyad because Ziyad had not yet become involved with terrorism, *id*., although Farhan did believe it was friends of Ziyad who shot Farhan in 2007 when they suspected Farhan was cooperating with the U.S. Military. *Id*. According to Farhan, he never advised the U.S. Military that Imad was the source of his information because he was never asked to identify the source and because Farhan speculated the U.S. Military had such great trust in Farhan there was no need to question Farhan's source. *Id*. at Bates 0335.

During the polygraph exam, Farhan also newly reported that prior to the arrival of Coalition Forces in Iraq, Farhan was considered "dangerous" and traveled around his neighborhood armed with two pistols. Form FD-498 at Bates 0335. According to Farhan, Ziyad was aware of Farhan's reputation as dangerous and never would have attempted to kill or harm Farhan. *Id*. When Farhan was asked about involvement with violence against Coalition Forces and whether he had been a "bad man" or done "bad

---

[24] Pike Declaration Exh. E (Saleh Action, Dkt. 56-6; Farhan Action, Dkt. 47-6).
[25] It is not clear from the record if Imad was detained by American, Coalition, or Iraqi forces.

things," Farhan refused to elaborate. *Id*. Farhan also reported to the U.S. Military about a cache of weapons buried by Al Qaeda in the back yard of his father's house in Ramadi, when Farhan knew it was Imad who buried the weapons. *Id*. Upon receiving the information, the U.S. Military went to Farhan's father's house and seized the weapons cache which included rifles, grenades, rockets, mortars, and ammunition. *Id*. At Farhan's request, the examination was stopped and Farhan was escorted out of the FBI's office. *Id*. at Bates 0336. By letter dated December 6, 2017 ("December 6, 2017 Letter"),[26] FBI Special Agent in Charge Adam S. Cohen ("SA Cohen"), advised USCIS that a search of U.S. Central Command ("USCENTCOM") files corroborated Farhan's assistance to the U.S. Military in Iraq, but failed to substantiate Farhan was a "high-level source," or had informed on his brothers Imad and Ziyad. December 6, 2017 Letter at Bates 0351. The information Farhan provided pertained to individual and groups who represented competing factions to Farhan's brother's insurgent group. *Id*. at Bates 0351-52. Further, there were no records substantiating that Imad's arrest was coordinated by Coalition Forces or the U.S. Military based on any information provided by Farhan. *Id*. at Bates 0352.

On December 28, 2017, USCIS issued decisions denying Petitioners' Naturalization Applications. Harlach Declaration Exhs. 11 (Saleh Action, Dkt. 56-19; Farhan Action, Dkt. 47-19 ("Farhan Denial")), and 12 (Saleh Action, Dkt. 56-20; Farhan Action, Dkt. 47-20 ("Saleh Denial")). Farhan's Naturalization Application was denied because Farhan gave untruthful sworn statements that he had never been arrested, convicted or imprisoned outside the United States on his Status Adjustment Application,

[26] Pike Declaration Exh. F (Saleh Action, Dkt. 56-7; Farhan Action, Dkt. 47-7).

and failed to disclose on his Refugee, Status Adjustment, and Naturalization Applications providing material support to terrorists, to wit, Farhan's brothers Imad and Ziyad who were members of Al Qaeda. Saleh's Naturalization Application was denied because she failed to disclose on her Refugee, Status Adjustment, and Naturalization Applications her provision of material support to Imad and Ziyad when they were terrorists. The material support Petitioners provided included food and shelter to Imad and Ziyad. In appealing the denials, Saleh attributed any support she provided to Imad and Ziyad to their familial relationship, rather than based on their status as members of a terrorist organization, arguing such support should not be considered material, and should be deemed "de minimis." Harlach Declaration Exh. 13 (Saleh Action, Dkt. 56-21; Farhan Action, Dkt. 47-21) at Bates 0238.

On August 1, 2018, USCIS affirmed the denials of Petitioner's Naturalization Applications. This action followed.

## DISCUSSION

### 1. Summary Judgment

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b) ("Rule 56__"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The court is required to construe the evidence in the light most favorable to the non-moving party, *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011), and summary judgment may not be granted based on a credibility assessment. *See*

*Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 55 (2d Cir. 2017) ("Adverse parties commonly advance conflicting versions of the events throughout a course of litigation. In such instances on summary judgment, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." (citations, quotation marks, and brackets omitted)). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)). A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133,137 (2d Cir. 2009)).

In the instant case, Respondent argues in support of summary judgment that Petitioners' provision of material support to Al Qaeda members bars them from ever becoming naturalized American citizens, Respondent's Memorandum at 10-16, and Farhan's naturalization is further precluded by his failure to disclose his arrest and incarceration in Iraq. *Id*. at 16-20. In opposition to summary judgment, Petitioners argue Saleh did not provide material support to anyone Saleh knew was a member of any terrorist organization including Al-Qaeda, Petitioners' Response at 3-6, and that Farhan's failure to disclose his arrest and incarceration in Iraq while a teenager does not establish Farhan lacks good moral character precluding his naturalization. *Id*. at 6-7. In further support of summary judgment, Respondent argues Respondents' Statement of Facts should be considered undisputed based on Petitioners' failure to comply with the Local and Federal Rules of Civil Procedure in responding to Respondents' factual statements, Respondent's Reply at 1-3, Petitioners' factual assertions are argumentative and irrelevant to the issues presented in this action, *id*. at

3-5, Saleh's provision of material support is not excused by her purported lack of knowledge about the status of Farhan's brothers as Al-Qaeda members, *id*. at 5, Farhan's subjective intent in supporting his brother Imad so as to maintain a relationship with Imad allowing Farhan to continue to obtain from Imad the information Farhan provided to the U.S. Military, *id*. at 6, Petitioner's arguments regarding waiver of inadmissibility are not reviewable and thus not properly before the court, *id*. at 6-8, and Farhan's misrepresentations regarding his arrest and incarceration preclude his naturalization. *Id*. at 8-10.

Preliminarily, Respondent argues Respondent's Statement of Facts should be accepted as undisputed because Petitioner, despite filing Petitioners' Responding Statement of Facts, failed to cite any evidence establishing Petitioners' version of the facts differ from Respondent's, as required by Federal and Local Rules of Civil Procedure. Respondent's Reply at 1-3. Petitioners have not responded to this argument, and a review of Petitioners' Responding Statement of Facts establishes Respondent's argument is correct, with Petitioners baldly disputing many of the factual assertions set forth in Respondent's Statement of Facts, but failing to point to any evidence supporting Petitioners' dispute.

As relevant, Rule 56 provides "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" by either a citation to the record or a "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Similarly, Rule 56 of the Local Rules of Civil Procedure

for the Western District of New York ("Local R. Civ. P. – WDNY 56__") requires each statement of undisputed fact:

> be followed by citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Fed. R. Civ. P. 56(c)(1)(A). Citations shall identify with specificity the relevant page and paragraph or line number of the evidence cited. Failure to submit such a statement may constitute grounds for denial of the motion.

Local R. Civ. P. - W.D.N.Y. Rule 56(a)(1).

Significantly, "Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). Further, "[r]ules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunt[ing] through voluminous records without guidance from the parties." *New York State Teamsters Conference Pension and Retirement Fund v. Express Services, Inc.*, 426 F.3d 640, 649 (2d Cir. 2005). Moreover, so long as a party's statement of undisputed facts submitted in support of summary judgment is supported by the record, the court may rely on them in considering the motion. *Id*. (accepting as true moving party's statement of facts submitted in support of summary judgment that was both fully supported by accompanying affidavits and disputed only by nonmoving party's conclusory assertions, and citing *Holtz v. Rockefeller & Co*., 258 F.3d 62, 73-74 (2d Cir. 2001) (refusing to rely solely on party's undisputed statement of facts where the cited materials did not support the factual assertions)).

In the instant case, Petitioners, in opposing summary judgment, fail to specifically identify any portion of the record upon which they rely in disputing Respondent's

properly supported Statement of Facts, simply asserting such facts are "Disputed," *see*, *e.g.*, Petitioners' Responding Statement of Facts ¶ 2, or providing conclusory explanations for disputing a fact without referencing any supporting evidence. *Id*. ¶ 14 (responding to Respondent's assertion that "Ziyad Farhan was a terrorist and Al Qaeda member' (citing Pike Declaration ¶ 8, Ex. A at Bates 0348; Exh. C; Exh. 7 at Bates 0250), with "Disputed – Petitioners lack personal knowledge as to Ziyad Farhan's activities or affiliation after they left Iraq. Al Qaeda and Al Qaeda in Iraq are distinct organizations."). As such, insofar as they are not sufficiently disputed by Petitioners' Responding Statement of Facts, the properly supported Respondent's Statement of Facts are deemed admitted. *New York State Teamsters Conference Pension and Retirement Fund*, 426 F.3d at 649.

**2. Overview of Naturalization and Immigration and Nationality Act**

To assist the reader, the court provides an overview of the INA, 8 U.S.C. ch. 12. "The INA governs immigration and citizenship in the United States." *Knights First Amendment Institute at Columbia University v. United States Citizenship and Immigration Services*, __ F.4th __; 2022 WL 1020379, at * 1 (2d Cir. Apr. 6, 2022). The Attorney General is vested by Congress with "sole authority to naturalize persons as citizens of the United States," 8 U.S.C. § 1421(a), which authority the Attorney General delegated to USCIS. *Iqbal v. United States Citizenship and Immigration Services*, 397 F.Supp.3d 273, 278 (W.D.N.Y. 2019) (citing *Rivera v. U.S. Citizenship & Immigration Servs*., 5 F.Supp.3d 439, 441 (S.D.N.Y. 2014)). A person whose application for naturalization is denied, after a hearing before an immigration officer under 8 U.S.C. § 1447(a), may seek *de novo* review of the denial in United States District Court in the

district in which the person resides, and "[s]uch review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application." 8 U.S.C. § 1421(c) ("§ 1421(c)"). Despite referencing a "hearing de novo," § 1421(c) does not require an evidentiary hearing where there are not genuine issues of material fact. *Chan v. Ganter*, 464 F.3d 289, 296 (2d Cir. 2006). Rather, where the record establishes there are no disputed issues of material fact, a challenge to the denial of a naturalization application may be resolved on summary judgment. *Id*. *See also Iqbal*, 397 F.Supp.3d at 278 ("'a court may grant summary judgment in cases brought under 8 U.S.C. § 1421(c).'" (quoting *Ali v. Holder*, 2012 WL 1014834, at *4 (W.D.N.Y. Mar. 22, 2012))).

An alien applying for naturalization must comply with all statutory requirements, and "the burden is on the alien applicant to show his eligibility for citizenship in every respect." *Iqbal*, 397 F.Supp.3d at 278 (quoting *I.N.S. v. Pangilinan*, 486 U.S. 875, 886 (1988)). Further, an alien's failure to affirmatively demonstrate he has met all statutory requirements to become a naturalized citizen may support summary judgment in favor of the Government. *Id*. (citing *Rivera*, 5 F.Supp.3d at 442)). The statutory requirements are set forth at 8 U.S.C. § 1427(a) as follows,

> No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously*, after being lawfully admitted for permanent residence*, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) during all the periods referred to in this subsection *has been and still is a person of good moral character*,

> attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a) (italics added) ("§ 1427(a)").

Accordingly, and relevant to the instant case, eligibility for naturalized citizenship requires the applicant have been lawfully admitted for permanent residency in the United States and have been a person of good moral character, denominated as the second and third requirements for naturalized citizenship. Moreover, "'[o]nce it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship,'" *I.N.S. v. Pangilinan*, 486 U.S. 875, 884 (1988) (quoting *Fedorenko v. United States*, 449 U.S. 490, 517 (1981)), and any doubts about an applicant's eligibility for citizenship must be resolved against the applicant. *Nwozuzu v. Holder*, 726 F.3d 323, 332 (2d Cir. 2013) (citing *Berenyi v. Dist. Dir. INS*, 385 U.S. 630, 637 (1967)).

**3. Material Support to Al Qaeda Members**

Both Petitioners' applications were denied because USCIS determined both Petitioners had provided material support to Al Qaeda, a Tier I Terrorist Organization, by providing food and shelter to Fahran's brothers. According to Respondent, because Petitioners provided Farhan's brother, *i.e.*, terrorists, with material support, Petitioners were not lawfully admitted for permanent residence in this country because they did not comply with all applicable provisions of the INA but are subject to the INA's "material support bar," 8 U.S.C. § 1182(a)(3)(B)(i)(I). Respondent's Memorandum at 10-16. In opposition to summary judgment, Petitioners argue when Saleh served Farhan's brothers with food, she was unaware the brothers were involved with Al Qaeda, Petitioners' Response at 3-4, she served Farhan's brothers under duress, *id*. at 4, and

only provided de minimis support. *Id*. Farhan argues he believed he was working against terrorism because by maintaining a close relationship with Emad, Farhan was able to obtain information he provided to the Iraqi and Coalition Forces so as to thwart, rather than support, terrorism, *id*. at 5, that Farhan voluntarily disclosed information regarding his brothers to the FBI in 2015, *id*., and that because he risked his life to provide such information, Farhan should be considered *nunc pro tunc* for an exemption from the material support bar. *Id*. at 5-6. In further support of summary judgment, Respondent argues Saleh's purported lack of knowledge that Imad was a terrorist does not excuse her from the material support bar, Respondent's Reply at 5, and Farhan's subjective intent is irrelevant to the material support bar's application. *Id*. at 6.

As relevant to the instant case, the INA "deems ineligible for asylum any alien who has 'engaged in terrorist activity.'" *Hernandez v. Sessions*, 884 F.3d 107, 109 (2d Cir. 2018) (quoting 8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I)). "In a provision known as the 'material support bar,' the INA defines '[e]ngag[ing] in [a] terrorist activity' to include committing an act that 'the actor knows, or reasonably should know, affords material support' to a terrorist organization." *Id*. (quoting 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)) (brackets in original).[27]

Here, as stated, Respondent argues in support of summary judgment that Petitioners' provision of material support to Al Qaeda members means Petitioners, pursuant to the so-called "material support bar," 8 U.S.C. § 1182(a)(3)(B)(i)(I), "engaged in a terrorist activity," such that Petitioners were not "lawfully admitted" to the United States and are precluded from ever becoming naturalized American citizens.

[27] Unless otherwise indicated, bracketed material has been added.

Respondent's Memorandum at 10-16. In opposition to summary judgment, Petitioners do not deny providing Imad and Ziyad with food and hospitality, but maintain that Saleh was unaware Farhan's brothers were Al Qaeda members, and acted under duress because she feared Imad and Ziyad. Petitioners' Response at 3-6.

In the instant case, as Respondent maintains, Petitioners were never "lawfully admitted" into the United States as required under 8 U.S.C. § 1427(a)(1) because Petitioners engaged in terrorist activity by providing material support to Farhan's brothers, *i.e.*, food and hospitality, and are thus precluded from becoming naturalized citizens pursuant to 8 U.S.C. § 1182(a)(3)(B)(i)(I) which plainly establishes that aliens who are "ineligible to be admitted to the United States" includes [a[ny alien who – has engaged in terrorist activity." Significantly, to be "lawfully admitted" requires strict compliance with the requirements set forth in 8 U.S.C. § 1427(a), including, as relevant here, that Petitioners were "lawfully admitted for permanent residence" pursuant to their Status Adjustment Applications which were approved on February 3, 2012. Despite apparently being granted lawful permanent resident status in the United States, "'[a]n alien whose status has been adjusted to lawful permanent resident ['LPR'] but who is subsequently determined in an immigration proceeding to have originally been ineligible for that status has not been 'lawfully admitted for residence' because the alien is deemed, ab initio, never to have obtained lawful permanent resident status.'" *Villafana v. Holder*, 358 Fed.Appx. 245, 246 (2d Cir. 2009) (quoting *De La Rosa v. U.S. Dep't of Homeland Sec.*, 489 F.3d 551, 554 (2d Cir. 2007)). Even where LPR status is obtained by mistake rather than fraud, a petitioner who fails to demonstrate compliance "with the relevant substantive legal requirements" when admitted for permanent residence, was

never "lawfully admitted for permanent residence . . . ." *Id*. (citing *De La Rosa*, 489 F.3d at 555. In the instant case, Petitioners, when admitted for permanent residence, were not lawfully eligible for such status because they engaged in terrorist activity by providing material support to terrorists, *i.e.*, Farhan's brothers, and are thus subject to the Act's "material support bar," 8 U.S.C. § 1182(a)(3)(B)(i)(I).

The provision of material support to members of a terrorist organization is considered as providing material support to the terrorist organization itself. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd) (specifying the material support bar prohibits the provision of material support "to a terrorist organization . . . or to any member of such an organization. . . ."). Further, preparing and providing food and hospitality to a member of a terrorist organization has been held to constitute "material support" for purposes of the material support bar. *See Ay v. Holder*, 743 F.3d 317, 319 (2d Cir. 2014) (upholding the BIA's administrative findings that the petitioner's provision of food on four or five occasions, and clothing on one occasion, constituted providing material support to a terrorist organization within the meaning of the Act, rendering the petitioner inadmissible). Significantly, both Farhan and Saleh admitted providing Farhan's brothers with food and hospitality. Farhan's April 25, 2017 Interview Tr. at Bates 0252-53; Saleh's April 25, 2017 Interview Tr. at Bates 0191-92. Both Farhan and Saleh also admit Imad and Ziyad were members of Al Qaeda. Saleh April 25, 2017 Interview Tr. at Bates 0193; Farhan's April 25, 2017 Interview Tr. at Bates 0247. Accordingly, the material support bar applies to both Farhan and Saleh.

Saleh's provision of material support is not excused by her purported lack of knowledge about the status of Farhan's brothers as Al-Qaeda members, Petitioners'

Response at 3-4. Although Congress has created a "knowledge waiver" for deserving aliens to avoid the consequences of the material support bar when the alien "can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization," 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd), such waiver applies only if the organization to which the alien gave support was a "Tier III" terrorist organization. *Jabateh v. Lynch*, 845 F.3d 332, 340 (7th Cir. 2017) (citing 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd)). "If an alien gave material support to a Tier I or Tier II organization, he is barred from entry regardless of whether he knew it was a terrorist organization." *Id*. As relevant here, Al Qaeda has been designated a Tier I terrorist organization since October 8, 1999. *See* U.S. Department of State, Designated Foreign Terrorist Organizations, *available at* https://www.state.gov/foreign-terrorist-organizations/,[28] a fact which Petitioners do not deny. Accordingly, the knowledge exemption is inapplicable.

Nor is there any merit to Saleh's argument, Petitioner's Response at 6-7, that the support she provided to Farhan's brothers was both *de minimis* and provided under duress. Rather, the Second Circuit recognizes the BIA's consistent construction of the INA as not providing for a *de minimis* or duress exception for the material support bar. *See Hernandez v. Sessions*, 884 F.3d 107, 110-11 (2d Cir. 2018) (citing cases). Similarly, "[t]he Federal circuit courts that have addressed this issue in a precedent decision have all held that the material support bar does not include an implied exception for aliens who provided material support to a terrorist organization under

[28] "The Secretary is authorized to designate an organization as a foreign terrorist organization . . . ." 8 U.S.C. § 1189(a)(1). Tier I and Tier II organizations are publicly identified terrorist groups and include Al Qaeda. *Heartland Alliance National Immigrant Justice Center v. U.S. Dep't of Homeland Security*, 840 F.3d 419, 420 (7th Cir. 2016).

duress." *In re M-H-Z*, 26 I. & N. Dec. 757, 760 (B.I.A. 2016) (collecting cases). Moreover, the waiver of an application of the terrorism-related bars are reserved to the "sole unreviewable discretion" of Secretary of State or the Secretary of Homeland Security, to be applied in certain circumstances after consultation with the other Secretary and the Attorney General. 8 U.S.C. § 1182(d)(3)(B)(i). *See also Ahmed v. Holder*, 624 F.3d 150, 153-54 (2d Cir. 2010) (observing federal courts lack jurisdiction to review denials of discretionary waivers such as 8 U.S.C. § 1182(d) (citing cases)). Accordingly, that Saleh may have provided material support to Farhan's brothers under duress does not excuse her participation in terrorist activity.

Furthermore, Farhan's asserted subjective intent in supporting his brother Imad so as to maintain a relationship with Imad from whom Farhan obtained the information he provided to the U.S. Military, Petitioner's Response at 5-6, is irrelevant. *See Khan v. Holder*, 584 F.3d 773, 777 (9th Cir. 2009) (an alien's intention is irrelevant for purposes of "engaging in terrorist activity" (citing *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000) ("money is fungible; giving supported intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts")). Significantly, Petitioners reference no caselaw to the contrary, nor has any been revealed by the court's research.

There is thus no merit to any of Petitioners' argument asserted in opposition to summary judgment insofar as Petitioners' Naturalization Applications were denied because Petitioners engaged in terrorist activities by providing material support to Farhan's brothers.

**4. Character**

With regard to Farhan, Respondent argues in support of summary judgment that Farhan's naturalization is precluded by his failure to disclose his arrest and incarceration in Iraq on his Status Adjustment Application. Respondent's Memorandum at 16-20. In opposition to summary judgment on this issue, Petitioners argue that Farhan's failure to disclose his arrest and incarceration in Iraq while a teenager does not establish Farhan lacks good moral character precluding his naturalization given Farhan was granted a waiver of inadmissibility for the arrest, Petitioners' Response at 6, USCIS was aware of the waiver when Farhan applied for adjustment of status rendering Farhan's failure to disclose the arrest on his Status Adjustment Application irrelevant, *id.*, and that Farhan disclosed in detail the arrest on his Naturalization Application. *Id.* Accordingly, Petitioner maintains there is an issue of fact as to whether Farhan intended to deceive USCIS by failing to disclose on a Status Adjustment Form an arrest for which the applicant was previously granted a waiver of inadmissibility. *Id.* at 6-7. In further support of summary judgment, Respondent repeats its argument that Farhan's misrepresentations regarding his arrest and incarceration on the immigration and naturalization forms completed by Farhan preclude his naturalization. Respondent's Reply at 8-10. Petitioners' arguments in opposition to summary judgment on this ground are without merit.

In his Refugee Application completed on December 5, 2007, Farhan Checked a box indicating he was responding "No" to a question regarding whether he had every been arrested, committed a crime, or helped someone else commit any crimes, Refugee Application at Bates 185, and provided a sworn statement indicating his

answers on the Refugee Application were correct. Later on December 5, 2007, Farhan was interviewed, under oath, by a Refugee Officer and affirmed the statements on his Refugee Application were correct. Refugee Application Assessment at Bates 0361-65. After a background check conducted by USCIS in connection with Farhan's Refugee Application revealed Farhan's 1986 arrest in Iraq, Farhan was re-interviewed by USCIS on March 27, 2008, and questioned about the arrest. Although Farhan initially indicated he had never been arrested, USCIS confronted Farhan with his Iraqi arrest record, and Farhan then explained the arrest occurred after Farhan took and sold a neighbor's pistol, for which Farhan was detained by police "for a few days," but was never actually incarcerated. Refugee Application Assessment at Bates 0354, 0358-59. USCIS initially denied the Refugee Application because Farhan's conviction constituted a crime involving moral turpitude rendering Farhan inadmissible pursuant to INA § 212(a)(2)(A)(i)(I); 8 U.S.C. § 1182(a)(2)(A)(i)(I). *Id*. at Bates 0359, but granted Farhan a waiver of inadmissibility on September 27, 2009, *id*. at Bates 0360, and Petitioners were admitted as refugees to the United States on September 1, 2010.

In his Status Adjustment Application filed September 9, 2011, Farhan again certified under penalty of perjury that his answers provided on the form, including the boxes Farhan checked for "No" for question asking whether he had provided "any type of material support to any person" engaged in "any . . . form of terrorist activity?" Status Adjustment Application, Part 3, Question 1, were true. On February 3, 2012, Farhan's Status Adjustment Application was approved with Farhan granted lawful permanent resident status in the United States. Farhan also failed to disclose his criminal conviction on his Naturalization Application filed July 16, 2015. In particular, Farhan

checked boxes to answer "No" to questions asking whether Farhan had ever been arrested, Naturalization Application, Part 11, Question 23, charged with a crime, *id*., Question 24, criminally convicted, *id*., Question 25, or incarcerated, *id*., Question 28, and failed to complete a table provided for Farhan to list any arrests, criminal charges, convictions, and incarcerations. *Id*., Question 29. Farhan was then interviewed by USCIS and orally confirmed the accuracy of his answers, including that he had no criminal record, and signed the Naturalization Application attesting to the veracity of the information Farhan provided under penalty of perjury. Harlach Declaration ¶¶ 31, 33-34; Farhan Naturalization Application at Bates 0070-73. It was not until his April 25, 2017 Interview in connection with his Naturalization Application that Farhan admitted he failed to reveal his arrest and conviction on the gun possession charge because he feared his Refugee, Status Adjustment and Naturalization Applications would be denied, and Farhan did not believe the 25-year old criminal conviction under the Sadaam Hussein regime was relevant. Farhan April 25, 2017 Interview Tr. at Bates 0267-68. Among the reasons why Farhan's Naturalization Application was denied was Farhan's failure to meet the INA's good moral character requirement based on Farhan's failure to truthfully reveal his arrest history. Farhan Denial at Bates 0020.

As discussed, Discussion, *supra*, at 24, one of the criteria for immigration and admission into the United States is that the person, at all times relevant to the immigration process, be of good moral character. 8 U.S.C. § 8 U.S.C. § 1427(a)(3). The INA also provides that "[n]o person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was -- * * * one who has given false testimony for the

purpose of obtaining any benefits under this chapter . . . ." 8 U.S.C. § 1101(f)(6). As used in § 1427(a), "'testimony' is limited to oral statements made under oath. *Kungys v. United States*, 485 U.S. 759, 780 (1988). Factually inaccurate statements rise to the level of "false testimony" when they are made with the "subjective intent of obtaining immigration or naturalization benefits," *id*., and there is no materiality requirement to § 1101(f)(6). *Baidis v. Lynch*, 664 Fed.Appx. 94, 97 (2d Cir. 2016). Unintentional misrepresentations are, by definition, not "willful" and misrepresentations made for such reasons as "embarrassment, fear, or a desire for privacy," are not considered to have been made with the subjective intent of obtaining immigration benefits. *Kungys*, 485 U.S. at 780. Further, "the agency's determination that an alien made false statements with such intent [is reviewed] for substantial evidence." *Baidis*, 664 Fed.Appx. at 97.

In the instant case, it was not until his deposition that Farhan actually discussed his criminal conviction in Iraq and that he was sentenced to a term of incarceration of three years, serving two years and three months. Farhan's Dep. Tr.[29] at 60-70. Specifically, Farhan testified he falsely misrepresented his criminal past in his various refugee, immigration, and naturalization applications because he was concerned the applications would have been denied. *Id*. Farhan also admitted at his deposition that the explanation for his arrest that he provided to the USCIS agent in Syria when interviewed in connection with his refugee application, *i.e.*, that Farhan was arrested on a gun possession violation after he took a gun from his neighbor to sell so that Farhan could give the neighbor the proceeds from the sale of the gun, was not true. *Id*. at 61-62. Farhan also testified that he falsely stated he was only detained for a few days, and

[29] References to "Farhan Dep. Tr." are to the pages of Farhan's deposition filed as Farhan Actin Dkt. 47-26.

was released after giving money to the man in charge of the prison. *Id*. at 66-67. Moreover, Farhan testified he lied about his criminal record in Iraq because he was desperate to get to the United States because his doctor in Syria told Farhan that the medical treatment Farhan needed for his head injury was available only in the United States, *id*. at 62-63, 69-70, and Farhan did not trust the Syrian interpreter. *Id*. at 67. The record thus establishes Farhan gave false testimony so as to obtain an immigration benefit, *i.e.*, admission to the United States.

Furthermore, insofar as Petitioners argue Farhan revealed his Iraqi arrest when interviewed by a USCIS agent in Syria in connection with his Refugee Application, Petitioners' Response at 6, a plain reading of the Refugee Application Assessment completed on March 27, 2008 in connection with Farhan's Refugee Application establishes that although Farhan admitted to some criminal activity, Farhan misrepresented the nature of such activity, notably that he was convicted on a gun possession charge and sentenced to a term of imprisonment of three years, describing the situation as selling a pistol for a neighbor to whom Farhan intended to give the proceeds of the sale, and being detained for only a few days by the police. Refugee Application Assessment at Bates 0354, 0358-59. Accordingly, even if there is any merit to Petitioners' novel argument regarding Farhan's character, unsupported by any case law, the argument does not apply to the facts of this case.

There thus is no merit to Petitioners' arguments opposing summary judgment on this ground.

## CONCLUSION

Based on the foregoing, Respondent's Motions (Saleh Action, Dkt. 56; Farhan Action, Dkt. 47) are GRANTED. The Clerk of Court is directed to close the files.

SO ORDERED.

/s/ *Leslie G. Foschio*

______________________________________

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED: April 29th, 2022
Buffalo, New York